**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Alfredo MONTEMAYOR,
Defendant-Appellant.**

No. 81–2202.

United States Court of Appeals,
Fifth Circuit.

Aug. 24, 1982.

Rehearing and Rehearing En Banc
Denied Sept. 22, 1982.

G. Rudolph Garza, Jr., Corpus Christi, Tex., for defendant-appellant.

Carl Walker, Jr., U. S. Atty., Houston, Tex., James R. Gough, John M. Potter, Robert A. Berg, Asst. U. S. Attys., Corpus Christi, Tex., for plaintiff-appellee.

Before BROWN, GEE and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

This is an appeal from a judgment of conviction for drug offenses under 21 U.S.C. §§ 841 and 846. The question is whether appellant's right to a fair trial was prejudiced by evidence of extraneous wrongdoing and by several acts of alleged prosecutorial misconduct. We hold that any error committed in these matters was harmless, for the overwhelming weight of the evidence supports the jury's verdict that appellant was guilty as charged. Appellant's conviction is therefore affirmed.

I.

Appellant Alfredo Montemayor ("Montemayor") was indicted and convicted on one count of possession with intent to distribute cocaine on December 3, 1980 (Count One), one count of distribution of cocaine on the same day (Count Two), and one count of conspiracy to distribute cocaine during the period December 1 to 3, 1980 (Count Seven).[1] Kenneth Wayne Scott ("Scott") was named a co-defendant and co-conspirator in the indictment. Shortly before trial, Scott accepted an offer of leniency from the government, and became one of its key witnesses against Montemayor. Scott's case was therefore severed from Montemayor's.

The government's evidence shows that on December 3, 1980, Scott sold cocaine to Sharon Trayler, an undercover agent for the Nueces County Sheriff's Department-

---

1. Montemayor was sentenced to ten years' imprisonment on Counts One and Two, with a special parole term of five years and a $5,000 fine on each count to run concurrently, and to a term of ten years' imprisonment and a $5,000 fine on Count Seven, to run consecutively to the sentence imposed on Counts One and Two.

Organized Crime Unit, and that Montemayor was Scott's source for this sale. Scott's testimony respecting Montemayor's involvement in the cocaine sale to Agent Trayler was corroborated, in almost every detail, by Agent Trayler herself and by the police officers who conducted surveillance on Montemayor. Montemayor's defense was that he met Scott, at the place where the cocaine was delivered to Scott, in order to collect a debt Scott owed him, and that Scott was lying about his involvement in the cocaine sale. Defense counsel sought to show that another individual was Scott's source. Montemayor did not testify. The government's evidence, however, was accepted by the jury, and it thoroughly demonstrated Montemayor's guilt. *See United States v. Wilkerson,* 534 F.2d 43, 44 (5th Cir. 1976).

## II.

Montemayor contends that his right to a fair trial was unduly prejudiced because of the introduction into evidence of certain extraneous offenses or bad acts committed by him, and that during the course of the trial, the prosecutor committed several acts of misconduct, particularly during his closing arguments.

### A. EXTRANEOUS OFFENSES.

1. *The Bank.* Agent Trayler testified that Scott, unaware she was an agent and believing her to be a purchaser, told her on December 3, 1980, that his source, a man who owned a health spa business, was going to a bank that morning to deliver five ounces of cocaine. Agent Raul Tovar, who was shadowing Montemayor, testified that he, in fact, followed Montemayor from his health spa to a bank that very morning.

Defense counsel objected to Trayler's testimony on grounds of hearsay, and the court granted him a running objection; however, he made no objection on the basis of an extraneous offense or bad act.[2] When a defendant objects to testimony on one ground at trial, and then urges on appeal that the objection should have been sustained on another ground, the plain error standard applies. *United States v. Pool,* 660 F.2d 547, 559 n. 4 (5th Cir. 1981). The introduction of this evidence, however, was not error, for the delivery of the cocaine to the bank was relevant evidence to prove the conspiracy count. *United States v. Gonzales,* 661 F.2d 488, 493–94 (5th Cir. 1981). Moreover, we hold that this evidence was admissible under *United States v. Beechum,* 582 F.2d 898, 911 n. 15 (5th Cir. 1978) (en banc), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979), to show that Montemayor was Scott's source for the cocaine sale to Agent Trayler.[3]

2. *The Prison.* Shortly after their arrest, Montemayor drove Scott to San Antonio to see an attorney and a paralegal. When Montemayor and Scott went to San Antonio, they were both being represented by attorney Max Luther. Luther had previously represented Montemayor on some oil transactions, and Montemayor made the initial contact with Luther in relation to the instant offenses. The attorney they saw in San Antonio, however, was Oscar Gonzales, who was afterwards hired by Montemayor to represent him at trial, and who, in fact, acted as Montemayor's trial counsel. The paralegal seen on this occasion, Oscar DeLeon, prepared several motions to be filed by Luther on behalf of Scott and Montema-

2. The hearsay objection was properly overruled by the trial court. During the initial stage of the trial, the trial court conducted a hearing outside of the presence of the jury to determine the existence of a conspiracy pursuant to *United States v. James,* 576 F.2d 1121 (5th Cir. 1978), *modified en banc,* 590 F.2d 575 (5th Cir. 1979). After hearing the testimony of Scott, Trayler, and the police officers who conducted the surveillance on Montemayor, the trial court held there was sufficient evidence of a conspiracy to allow into evidence the statements made

by Scott, a co-conspirator, to Agent Trayler. Under Fed.R.Evid. 801(d)(2)(E), Scott's statements to Trayler made during the course and furtherance of the conspiracy were not hearsay.

3. Having held that this evidence was properly admitted, we hold that there is no merit to Montemayor's argument that the reference to it in the prosecutor's final argument was an improper comment or constituted prosecutorial misconduct.

yor, which Montemayor told Scott would "get" them "off." In the presence of Gonzales, Scott signed an affidavit prepared by Gonzales which exonerated Montemayor from any connection with the sale to Agent Trayler. At trial, Montemayor sought to impeach Scott with this affidavit. During defense counsel's cross-examination, the following exchange occurred:

"Q Why did you tell Mr. Luther, 'Mr. Luther, I want to cooperate to straighten my life up and I need you to fire Montemayor or I'll take the case,' why did you have to fire Max Luther?

"A Well, it was the understanding between him that he had a conflict due to me coming forth and telling him the truth of the situation. Beforehand, I was under the impression that through all this time that we had the case beat. There was—

"Q I'm sorry, all this time, you thought you had this case beat, is that correct?

"A Right, from day one, there was nothing but positive thinking. Mr. Montemayor had kind of started the ball rolling. He got Mr. Max Luther as our attorney. I did not have to pay anything. We had talked and—about what we would say, what we would discuss, and all this is part of that letter. We came to you—

"Q You mean that affidavit?

"A The affidavit. You were being deceived.

"Q I was being deceived?

"A Yes.

"Q Okay.

"A There was a paralegal that Al had told me he taught law in prison and he was preparing motions—"

Defense counsel moved for a mistrial, but the trial court denied the motion. Defense counsel made no request for a curative instruction, and none was given at that point.

On redirect examination, Scott testified without objection that Montemayor told him he had taught law to Oscar DeLeon. Later, the following exchange took place:

"Q (By Mr. Berg) Has Mr. Montemayor ever been a law professor any place that you know of?

"A He said at one time that he had practiced law in prison.

"MR. GONZALES: Your Honor, at this time we move for a mistrial.

"THE COURT: Motion is denied.

"Q (By Mr. Berg) Have you ever been in prison?

"A No sir."

Scott was excused from the witness stand, and after the noon recess, the trial court, in response to defense counsel's request, instructed the jury as follows:

"THE COURT: Ladies and gentlemen of the jury, before our recess at noon there was a question asked as to whether or not—was asked of the witness Scott as to whether or not Alfredo Montemayor had been *a professor of law. You will disregard the answer to that question, and you will disregard the question, and just put it out of your mind because it is not a part of the testimony of the case.*" (Emphasis added.)

■ It was clearly proper to show a close relationship between appellant and DeLeon. Although the evidence that *prison* was the place at which Montemayor had taught law, or that he was "a law professor," was improper, we hold that the instruction given to the jury cured the error and its prejudicial effect in view of the overwhelming evidence of Montemayor's guilt. *United States v. Greene,* 578 F.2d 648, 653 (5th Cir. 1978), *cert. denied,* 439 U.S. 1133, 99 S.Ct. 1056, 59 L.Ed.2d 96 (1979); *United States v. Rojas,* 537 F.2d 216, 221–22 (5th Cir. 1976), *cert. denied,* 429 U.S. 1061, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977).

■ 3. *Witness Garcia's Conviction.* Montemayor produced Ramon Garcia to explain why Montemayor met Scott at the time and place where the cocaine was delivered to Scott for the sale to Agent Trayler. On cross-examination, the government impeached Garcia with what the prosecutor

thought was a felony conviction, but, what was, in fact, a misdemeanor conviction of conspiracy to possess marihuana with intent to distribute. The trial court instructed the jury to disregard this evidence, and we hold that the trial court's instruction cured the prosecutor's unintentional error.

4. *Witness Elliott.* Montemayor's wife, Carla Montemayor, testified that Montemayor did not participate in the internal operation of their health spa business, because it was a spa for women only. On rebuttal, the government produced Mrs. Jane Osborne Elliott. Before she testified, defense counsel, out of the presence of the jury, objected to the prosecution calling her to show that she had an argument with Montemayor in the women's area at the spa, as this was "another unrelated matter." The government countered by stating that this impeached Carla Montemayor's testimony. Defense counsel then said, "Well, if he wants to get into it, Your Honor, it is all right. It is improper, but it is also a rabbit trail." The prosecutor remarked that Elliott would also impeach attorney Luther's testimony, and stated, "I only have one or two more witnesses after this, and this won't take three minutes." The Court said, "All right, I will let you go on," and the out-of-court hearing concluded.

Mrs. Elliott then testified, without objection, stating she had been a "member" of the spa. The government thereupon offered her spa "enrollment card" in evidence and defense counsel initially objected but then stated, "We withdraw the objection." Mrs. Elliott subsequently testified, without objection, that she saw Montemayor in the dressing rooms of the spa; that she complained about this to him; and that her membership was terminated. Thereafter, the government sought to introduce a letter to Mrs. Elliott from attorney Max Luther terminating her membership, asserting that this impeached Luther's testimony that the only other matters he had represented Montemayor on were oil transactions. Defense counsel's objection to this letter was sustained.

The government argues that Elliott's testimony was proper rebuttal to what it characterizes as Mrs. Montemayor's evidence about her husband's good character and his Christian acts. Mrs. Montemayor, however, gave no such testimony. Her testimony primarily concerned the business aspect of their life. Although Mrs. Elliott's testimony should have been excluded, there was no proper objection to it, nor was there any request for an instruction to disregard any of this testimony, or any motion for mistrial respecting it. Under these circumstances, and since the testimony concerned a relatively insignificant collateral event and the proof of appellant's guilt was so strong, we do not believe that any reversible error is presented in this connection.

5. *Meeting Between Montemayor and Scott.* Montemayor called attorney David Herin to testify about a conversation between Herin and Scott shortly before Scott made his deal with the government. Defense counsel questioned Herin regarding what Scott told Herin about the plea offers made to Scott by the government. The next day, the government recalled Herin. Before Herin took the stand, however, during a discussion between the trial court and counsel regarding extraneous offenses committed by Montemayor that the government wished to prove, defense counsel agreed that the entire conversation between Herin and Scott could be introduced into evidence. Herin then testified and was asked by the government to tell all that Scott had said to him during their conversation. Among other things, he was asked what Scott had said concerning his initial meeting with Montemayor some two and a half years previously. Defense counsel objected, and a bench conference was held. When reminded by the prosecutor that he had previously said the entire conversation would be admissible, defense counsel twice stated, "I withdraw my objection." Herin then testified that Scott told him that the first time Scott met Montemayor, Montemayor had sold marihuana to one of Scott's friends. Defense counsel thereupon objected. Under these circumstances, we hold the error complained of was invited by defense

counsel. *See United States v. Cook*, 586 F.2d 572, 578 (5th Cir. 1978), *cert. denied*, 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274 (1979).

██ 6. *Safety and Protection.* On direct examination by defense counsel, attorney Herin testified that Scott wanted to make a deal with the government because he was afraid of going to jail, and that Scott said Corpus Christi Police Officer Ross told him, "We can provide protection and even relocation." Officer Ross testified for the government on rebuttal that Scott wanted governmental protection because he feared possible retaliation by Montemayor. We hold Scott's motives for seeking governmental protection and his discussions on this subject with Ross were areas of inquiry opened up by the defense, and that accordingly, the prosecution was entitled to show Ross's version of what Scott told him concerning these subjects.

## B. THE PROSECUTOR'S JURY ARGUMENT.

██ Montemayor contends that the prosecutor made several improper and prejudicial comments during his final jury arguments. Defense counsel, however, failed to object to any of these comments and made no motion for mistrial in regard thereto. Our review is therefore limited to the plain error standard of Fed.R.Crim.P. 52(b). *United States v. Okenfuss*, 632 F.2d 483, 485 (5th Cir. 1980). Under *Okenfuss*, we must decide whether the prosecutor's comments, taken as a whole in the context of the entire case, substantially prejudiced defendant's rights. Plain error may be recognized "only if the error is so obvious that our failure to notice it would seriously affect the fairness, integrity, or public reputation of judicial proceedings and result in a miscarriage of justice." *United States v. Graves*, 669 F.2d 964, 971 (5th Cir. 1982). The defendant's burden of showing plain error is a heavy one. *United States v. Pool*, 660 F.2d at 559. And, under Rule 52, not

even obvious, basic errors justify reversal if they are harmless. *United States v. Wilkerson*, 534 F.2d at 44.

1. *The October 1 and October 8 Offenses.* Montemayor was originally indicted for possession of cocaine with intent to distribute and for distribution of cocaine on October 1, 1980, and on October 8, 1980. Shortly before trial, the trial court advised the jury that the counts which concerned these offenses[4] had been dismissed on the government's motion. The government also stipulated that Montemayor was not the source of the cocaine sales which took place on those days.

██ During defense counsel's opening statement to the jury he accused the government of cheating. In the prosecutor's closing argument, he stated that:

> "I am still here prepared to say that defendant didn't have anything to do with the October 1st and October 8th, and I submit to you what I was simply trying to do was save us all a little bit of time and confine ourselves to the real issues."

Montemayor urges that these comments were improper expressions of the prosecutor's personal opinion on the merits of the case.

We hold there is no error in these remarks, for they were a fair response to defense counsel's charge in his opening statement to the jury that the government was cheating. *United States v. Hiett*, 581 F.2d 1199, 1204 (5th Cir. 1978).

██ 2. *Good Police Work.* During the trial, Agent Trayler testified that she memorized Montemayor's telephone number when Scott called him to arrange delivery of the cocaine. During the final argument, the prosecutor stated:

> "I consider it to be good police work, I don't know what the jury will consider it to be, was that beeper thing with the telephone number, call back Al, you see, with the number and the number went right back over there to Feminique."

---

**4.** The counts that concerned the October 1 and 8 offenses were Counts Three, Four, Five, and

Six.

We hold that there is no plain error, for this evidence was in the record, and whether Agent Trayler did a good job or a bad job was not a prejudicially improper subject for passing comment during argument. *United States v. Hiett,* 581 F.2d at 1204.

3. *Collection of Debt.* Montemayor attempted to explain his presence at the location where the cocaine was delivered to Scott on December 3, 1980, by showing, through several witnesses, that he was there to collect a debt Scott owed him. During the final argument, the prosecutor made the following comments:

> "I don't know about you folks, but if someone owes me $600, I am trying to collect, I ain't gonna say, 'Hey, Ken, you gotta phone call next door,' I'm gonna come in and say, 'Ken, you got my money yet?'"

Although these remarks were perhaps technically improper as a personal vouching by the prosecutor, after reviewing the entire record and the context within which they were made, we are unable to say that the remarks constituted plain error. Their substance, though not their form, was a proper appeal to the common sense of the jury and their understanding of the ways in which ordinary affairs are usually conducted. The jury was unlikely to have given any other significance to them than an appeal to their common sense and understanding of human affairs.

4. *Cheating.* During defense counsel's opening statement to the jury and in his final argument, he accused the government of cheating. During the rebuttal jury argument, the prosecutor made the following comments:

> "I am concerned with cocaine. I'm concerned with obeying the laws of the United States. My concerns, I'm proud to say, are a little bit broader than his, and I'll tell you something else, this is the first time in almost ten years of prosecut-

ing it's ever been said that I cheated. I don't feel like I have cheated here, and I have got a few things to tell you, if there is any cheating going on—

> "THE COURT: Let's don't get into that, Mr. Berg. Argue the facts.

> "MR. BERG: All right, I won't, Your Honor . . . ."

We agree with the government that this was a fair comment in reply to defense counsel's charge that the government was cheating. *United States v. Hiett,* 581 F.2d at 1204. Nor is a prosecutor's expression of personal zeal for law enforcement normally prejudicial error. *United States v. Ochoa,* 564 F.2d 1155, 1159 (5th Cir. 1977), *cert. denied,* 436 U.S. 947, 98 S.Ct. 2853, 57 L.Ed.2d 789 (1978).

5. *The Paralegal and Scott.* The final act of asserted misconduct concerns a passing comment regarding Montemayor's training of paralegals. In the prosecutor's closing argument, he stated:

> "Now, let me ask you this, if you were that man Alfredo Montemayor and you had somehow innocently gotten embroiled in a cocaine offense, would you be carrying Scott over to San Antonio to see paralegals you had trained and taking him to see Oscar Gonzales and paying him $10,000 attorneys' fees when all Scott has got to pay is $300 to the same lawyer? Would you be so generous? Of course you wouldn't be. You see exactly what was happening to the man."

This was a proper comment based on evidence admitted without objection that Montemayor had taught law to Oscar De-Leon, a paralegal,[5] and on the unobjected to evidence of Montemayor's and Scott's fee arrangement with attorney Max Luther. The comments were a legitimate argument that it could be inferred from the evidence that Scott was duped into signing the affidavit purporting to exonerate Montemayor.

---

5. Montemayor's argument that the prosecutor's reference to his having "trained" a paralegal constituted prosecutorial misconduct is without merit, for the prosecutor did not mention that Montemayor had been "a professor of law" or that the training of the paralegal oc-

curred *in prison*, which was the subject of the court's curative instruction. There was, however, evidence admitted without objection that Montemayor trained Oscar DeLeon, who was a paralegal.

We finally note that in another setting, with less convincing proof of guilt, more timely and proper objections by defense counsel, and less "opening of the door," some of the prosecutorial actions of which appellant complains, at least if related to more sensitive matters than here, might well result in reversal. That such actions do not warrant a reversal of this case should not suggest that we approve of them or that they merit emulation. However, as we find no reversible error in the particular circumstances of this case, the judgment of conviction is affirmed.

AFFIRMED.