**UNITED STATES of America,**
**Plaintiff–Appellee,**

**v.**

**Abdallah M. EL–ZOUBI, Defendant–Appellant.**

**No. 92–1128.**

United States Court of Appeals,
Fifth Circuit.

June 4, 1993.

Gerhard Kleinschmidt, Fort Worth, TX, for defendant-appellant.

Christopher A. Curtis, John P. Bradford, Asst. U.S. Attys., Richard H. Stephens, U.S. Atty., Fort Worth, TX, for plaintiff-appellee.

Before WISDOM, DAVIS and SMITH, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Abdallah M. El–Zoubi (El–Zoubi) was charged in a superseding indictment with conspiracy, mail fraud, and arson, in violation

of 18 U.S.C. §§ 371, 1341, 844(i), and 2, respectively. After a jury trial, he was convicted on all counts. On the arson count he received a sentence of 120 months of imprisonment, to be followed by five years of supervised release. His sentences on the conspiracy and mail fraud counts run concurrently with his arson sentence, and call for 60 months of imprisonment, to be followed by three years of supervised release. El–Zoubi appeals his conviction and sentence. We affirm his conviction and his sentence.

## I.

In May of 1991 El–Zoubi purchased the Almadafa International Market, also known as the Holy Land Market (the market), in Arlington, Texas. The next month, after obtaining fire insurance for the market, El–Zoubi paid his 20 year old nephew, Adel Ahmad Saliem Alzoubi (Adel), to burn it down. The fire occurred around 9:30 p.m. on June 14. A trail of footprints burned into the market's tile floor led fire fighters to Adel's body. Predictably, examiners determined the cause of death to be smoke inhalation, carbon monoxide poisoning, and extensive burns. The fire caused about $200,000 of damage to the strip mall in which the market was located.

## II.

We initially consider El–Zoubi's conviction. First, he argues that the evidence was insufficient to support his conviction. Second, he contends that the trial court erroneously admitted hearsay testimony offered by the government. Third, he claims that comments made by prosecutors warranted a mistrial. Finally, El–Zoubi argues that he received ineffective assistance of counsel. We consider these arguments in turn.

### A.

■ El–Zoubi first challenges the sufficiency of the evidence supporting his conviction. We review the evidence in the light most favorable to the verdict. *United States v. Williams,* 985 F.2d 749, 753 (5th Cir.1993). And we ordinarily affirm if a rational trier of fact could have found that the evidence es-

tablishes the essential elements of the offense beyond a reasonable doubt. *Williams,* 985 F.2d at 753. However, because El–Zoubi failed to move for judgment of acquittal at the close of the evidence, we may set aside the conviction only if affirmance would result in a "manifest miscarriage of justice." *United States v. Singer,* 970 F.2d 1414, 1418 (5th Cir.1992). Under this standard, we may reverse El–Zoubi's conviction only if "the record is devoid of evidence pointing to guilt." *Singer,* 970 F.2d at 1418.

■ El–Zoubi's conviction for conspiracy under 18 U.S.C. § 371, required the government to prove beyond a reasonable doubt that (1) El–Zoubi and Adel agreed to pursue an unlawful objective together; (2) El–Zoubi voluntarily agreed to join the conspiracy; and (3) that either El–Zoubi or Adel performed an overt act to further the objectives of the conspiracy. *United States v. Parekh,* 926 F.2d 402, 406 (5th Cir.1991). El–Zoubi's mail fraud conviction under 18 U.S.C. § 1341 required proof beyond a reasonable doubt of (1) a scheme to defraud; and (2) El–Zoubi's use of the mails for the purpose of executing the scheme. *United States v. Church,* 888 F.2d 20, 23 (5th Cir.1989). A conviction for arson under 18 U.S.C. § 844(i) requires proof beyond a reasonable doubt that (1) the defendant maliciously damaged or destroyed a building; (2) he did so by means of fire; and (3) the building was being used in an activity affecting interstate commerce. *United States v. Triplett,* 922 F.2d 1174, 1177 (5th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2245, 114 L.Ed.2d 486 (1991). Accomplice liability under 18 U.S.C. § 2 requires a showing that El–Zoubi (1) acted in a way that contributed to the execution of the criminal activity; and (2) intended to aid in its commission. *Triplett,* 922 F.2d at 1177–78.

■ We summarize below the evidence on which the government relies to support El–Zoubi's conviction on the counts referred to above. El–Zoubi was in dire financial straits: his checking account at the Federal Savings Banc had just been closed because of excessive insufficient funds checks; he owed over $500 on a Visa credit card that had just been cancelled; he had been denied a bank loan; he had to borrow $300 to cover a bad

check he had written; and his wife had just filed for divorce. Moreover, the business was failing: lease payments had fallen behind by $6,625; inventory was low; and business was poor—the day of the fire, the market made only a four dollar sale.

On June 7, El–Zoubi applied for $50,000 of fire insurance, representing that sales at the market amounted to $300 a day. In the following days, he asked his insurance agent three times if the application had been approved. Two days before the fire, the application was approved. The next day, El–Zoubi paid the premium, and sought assurances that any insurance proceeds would be paid to him. That day El–Zoubi told another shop keeper in the same strip shopping center, "we got our insurance."

The day of the fire, El–Zoubi asked Rami Ghanem, an acquaintance whose business had burned, whether he had any difficulties with fire investigators or the insurance and also told him, referring to the market, "I'm going to knock it down today." The fire was reported at 9:22 p.m. The fire fighters found all doors locked, even though the business was scheduled to be open until 10:00 p.m. Inside they found Adel's body. Investigators found that the fire was intentionally set and of an incendiary nature. In Adel's truck, investigators found a $5,000 check to Adel, signed by El–Zoubi and postdated to June 30. At the time of the fire, the balance in El–Zoubi's account was $261.16.

The fire caused $200,000 of damage to the shopping center structure. The market and neighboring businesses were closed. El–Zoubi concedes that the market was used in an activity affecting interstate commerce. This evidence amply supports the jury's apparent conclusion that El–Zoubi paid Adel to burn the market in order to fraudulently collect fire insurance proceeds, and that he used the mails to further this scheme.

### B.

■ El–Zoubi next argues that the district court erroneously admitted testimony about a conversation between Adel and Salif Alahmad (Alahmad), who owns a photo business in the strip shopping center that housed the market. According to Alahmad, four days before the fire, Adel said that he was "sick and tired of [the market]" and was going to "burn it down and get out of Arlington." The government concedes that the statement constituted hearsay, but argues that it was admissible under Fed.R.Evid. 801(d)(2)(E), the coconspirator exception to the hearsay rule.

■ In order to fit the coconspirator exception, a statement must have been made (1) by a coconspirator of a party, (2) during the course of the conspiracy, and (3) in furtherance of the conspiracy. *United States v. McConnell,* 988 F.2d 530 (5th Cir.1993). Although the evidence supports a finding that Adel and El–Zoubi were coconspirators, it does not support a conclusion that Adel's statement was made in furtherance of the conspiracy. The government argues that Adel's statement was made in furtherance of the conspiracy because it identified his role in the conspiracy. "Ordinarily, a statement that identifies the role of one coconspirator to another is in furtherance of the conspiracy." *United States v. Lechuga,* 888 F.2d 1472, 1480 (5th Cir.1989) (quotations omitted). However "mere conversation between conspirators" does not fit within this exception. *McConnell,* 988 F.2d at 533. The statement in question was not made to a coconspirator. Moreover, the record does not allow the inference that Adel thought the conspiracy would be more likely to succeed if Alahmad knew of Adel's intent to burn the market. Therefore it was error to admit Adel's statement under the coconspirator exception to the hearsay rule.

■ Nevertheless, the error was harmless. In determining whether the admission of hearsay evidence was harmless, we must consider the other evidence in the case, and then decide if the inadmissible evidence actually contributed to the jury's verdict. *United States v. Evans,* 950 F.2d 187, 191 (5th Cir.1991). We will find such testimony harmful and reverse a conviction only if it had a "substantial impact" on the jury's verdict. *Evans,* 950 F.2d at 191. The statement is probative of Adel's intent to burn down the market. Yet, as we have already explained, the physical evidence overwhelm-

ingly established this fact. Thus, viewing the evidence as a whole, we conclude that the statement had no effect on the verdict. *Evans,* 950 F.2d at 191.

### C.

 El–Zoubi next argues that the district court should have declared a mistrial because the prosecutor made inappropriate remarks at trial. Because El–Zoubi did not object to any of these comments, we review for plain error. We ask "whether the prosecutor's comments, taken as a whole in the context of the entire case, substantially prejudiced defendant's rights." *United States v. Montemayor,* 684 F.2d 1118, 1124 (5th Cir. 1982). We recognize plain error "only if the error is so obvious that our failure to notice it would seriously affect the fairness, integrity, or public reputation of judicial proceedings and would result in a miscarriage of justice." *Montemayor,* 684 F.2d at 1124.

 El–Zoubi first challenges the prosecutor's statement that the conspiracy and mail fraud counts could be established by evidence that El–Zoubi knew the store was insured, had an interest in its being insured, and believed that the insurance provided the source for his payment. The prosecutor prefaced his comment with the statement: "[T]he court will instruct you with regard to a conspiracy." And the court subsequently gave an accurate explanation of the law of conspiracy. So even if the argument was improper, which is doubtful, taken as a whole, it did not substantially prejudice El–Zoubi's rights.

 Second, El–Zoubi points to the prosecutor's characterization of Ghanem as someone who showed El–Zoubi "how to buy this food, where the sources were." In fact, a different person had helped El–Zoubi in this manner. El–Zoubi argues that this misstatement made it more plausible for the jury to believe that El–Zoubi would confide in Ghanem his plans to burn the market. El–Zoubi further contends that this misstatement undermined El–Zoubi's defense that he would not confide in someone he did not know. However the prosecution was trying to make a different point, that El–Zoubi confided in Ghanem because he believed that Ghanem

had intentionally burned his business for the insurance:

> When you want to know how to burn your place down, you ask Rami Why do you ask Rami? Because in Abdullah's twisted thinking, Rami's store burned and so Rami burned his store, Rami collects his insurance. So you go ask Rami: "Rami, did you have any trouble with the fire inspectors or collecting your insurance." You go to the source and that is why he asked him what he did and that is why he said what he said.

The prosecution's misstatement did not amount to plain error.

 Third, El–Zoubi contends that the prosecutor inappropriately commented on his decision not to testify. In his closing argument, the prosecutor said:

> That insurance was taken out on the Holy Land Market, that they had the scheme to defraud, the scheme being insure a building and burn it, that he obtained insurance coverage, **not disputed.** That he caused another person to mail something for the purpose of carrying out the scheme, **not disputed.** . . . That a third person maliciously damaged and destroyed the building, housing the . . . Holy Land Market. **Not disputed.** (Emphasis added.)

El–Zoubi argues that the phrase, "not disputed," was a veiled reference to his decision not to take the stand.

 A prosecutor inappropriately comments on the defendant's decision not to testify if he "manifestly intended" to do so, or if the statement "was of such character that a jury would naturally and necessarily take it" to be a comment on the defendant's failure to testify. *United States v. Jennings,* 527 F.2d 862, 870–71 (5th Cir.1976). However the prosecution may point out "that the testimony of witnesses is uncontradicted, particularly where someone other than the defendant could have offered contrary evidence." *Jennings,* 527 F.2d at 870–71. Because witnesses other than the defendant could have contradicted the government's witnesses, the prosecutor's remarks were not improper.

**D.**

Finally, El–Zoubi argues that he was not given effective assistance of counsel. He complains, first, that his counsel persuaded him not to take the stand, second, that his counsel failed to call witnesses crucial to his defense, third, that he did not properly cross-examine witnesses, fourth, that his counsel filed no pretrial motions other than a motion for continuance, and, fifth, that his counsel should have had the Arabic interpreter translate the entire trial. In an attempt to circumvent our plain error standard of review on the previous issues, El–Zoubi argues, sixth, that his counsel should have moved for judgment of acquittal, seventh, that he should have properly objected to the introduction of hearsay testimony, and, finally, that his counsel should have objected to the prosecutor's inappropriate questions and remarks.

El–Zoubi must satisfy the familiar two-prong test set out in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, El–Zoubi must prove "that counsel's performance was deficient," in other words, "that counsel made errors so serious that counsel was not functioning as counsel guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. Second, El–Zoubi must show that "the deficient performance prejudiced the defense," that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. Judicial scrutiny of the first prong of the test—the adequacy of counsel's performance—is highly deferential. We "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and that the "challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

El–Zoubi raised the first four arguments in a post-trial motion for appointment of new counsel, and in a hearing on that motion. El–Zoubi's counsel explained that he thoroughly investigated the case. His efforts included nearly ten hours of discussion with his client, three visits to the scene of the fire, inspection of physical evidence at the Arlington Fire Department and in the office of the United States Attorney, and personal interviews with several government and defense witnesses. Through informal discovery, he obtained copies of Adel's autopsy report, the A.T.F. report, the Arlington Fire Department report, summaries of the witnesses' statements and copies of the other documentary exhibits. El–Zoubi's counsel further explained that the witnesses he did not call could only provide cumulative or irrelevant testimony, or were not credible. Finally, he explained that, although he had prepared questions for direct examination of El–Zoubi, he made the strategic choice to advise El–Zoubi not to take the stand.

After the hearing, the district court found that El–Zoubi had "excellent representation during the trial." The court said: "there has not been any failure of [El–Zoubi's counsel] to perform his duties properly. In fact, I think he performed his duties as an attorney for the defendant in an exemplary fashion." The court added that "the facts of the case the jury heard justified the jury's verdict, and I don't think anything you have suggested here that should have been developed would have changed the outcome of the case if it had been developed." The court further suggested that "some of the things I heard here would have done you more harm than good in the presence of the jury."

After reviewing the record, we are unpersuaded that defense counsel performed in a constitutionally inadequate manner by not calling particular witnesses, advising El–Zoubi not to take the stand, failing to ask unspecified questions on cross-examination, or failing to file unspecified pretrial motions. *Valles v. Lynaugh*, 835 F.2d 126, 128 (5th Cir.1988); *Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir.1984); *United States v. Garcia*, 762 F.2d 1222, 1226 (5th Cir.), cert. denied, 474 U.S. 907, 106 S.Ct. 238, 88 L.Ed.2d 239 (1985). The remaining ineffective assistance of counsel arguments were not raised below, and therefore are not properly reviewable on this direct appeal. *United States v. Stone*, 960 F.2d 426, 438 (5th Cir.1992).

## III.

We next consider El–Zoubi's challenges to his sentence. First, he argues that the maximum sentence allowed by statute was 10 years, not "any term of years." Second, he contests the district court's determination that he played a leadership role in the offense. Third, El–Zoubi argues that the district court should have grouped all three counts together, instead of into two groups. Finally, he argues that the court should not have upwardly departed from his sentencing range.

## A.

■ The only serious sentencing question involves the district court's upward departure from El–Zoubi's sentencing range. U.S.S.G. § 2K1.4(c), the arson guideline, instructs the court: "If death resulted, ... apply the most analogous guideline from Chapter Two, Part A (Offenses Against the Person) if the resulting offense level is greater than that determined above." The presentence report (PSR) and the district court chose the involuntary manslaughter guideline, § 2A1.4, as "the most analogous guideline." The base offense level for involuntary manslaughter is 14, far less than the base offense level of 20 for an arson that does not result in death. See U.S.S.G. § 2K1.4(a)(2). So the district court used the base level of 20. The court then upwardly departed, concluding that Chapter 2, Part A did not adequately take into consideration "the defendant's knowingly risking the life of others, including his nephew, the inhabitants of other businesses, and fire fighters," or the death that resulted.

Reviewing the district court's application of the guidelines de novo, *United States v. Galvan–Revuelta*, 958 F.2d 66, 68 (5th Cir. 1992), we conclude that the district court misapplied the arson guideline, § 2K1.4(c). Specifically, we conclude that the "most analogous guideline" from Chapter Two, Part A is the first degree murder guideline, § 2A1.1, not the involuntary manslaughter guideline, § 2A1.4. Had the court correctly applied the guidelines, the sentencing range would have called for a prison term longer than the 120 months El–Zoubi received.

■ In reaching this conclusion, we note, first, that El–Zoubi's offense is more analogous to first degree murder than to negligent homicide. 18 U.S.C. § 1111(a) provides in relevant part: "Murder is the unlawful killing of a human being with malice aforethought. Every murder ... committed in the perpetration of, or attempt to perpetrate, any arson, ... is murder in the first degree." The English common law provided that one who caused another's death while committing or attempting to commit a felony was guilty of murder even though he did not intend to kill the deceased. *United States v. Browner*, 889 F.2d 549, 552 & n. 2 (5th Cir.1989). Section 1111(a) applies the felony murder rule to arson and other enumerated felonies. *United States v. Herman*, 576 F.2d 1139, 1143–44 & n. 2 (5th Cir.1978). Proof of premeditation or deliberation is not required under the felony murder component of § 1111. *United States v. Antelope*, 430 U.S. 641, 644, 97 S.Ct. 1395, 1397–98, 51 L.Ed.2d 701 (1977). The language of § 1111 is broad enough to include cases in which an arsonist's accomplice dies during the commission of the felony. Moreover, the death of an accomplice is a foreseeable result of procuring him to commit an arson. In cases directly on point with this one, the supreme courts of Kansas, Georgia, Rhode Island, and Pennsylvania have held that an arsonist may be punished under the felony murder doctrine for the death of an accomplice.[1]

In contrast, 18 U.S.C. § 1112 defines involuntary manslaughter as "the unlawful killing of a human being without malice ... [i]n the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might

---

1. *State v. Thai Do Hoang*, 243 Kan. 40, 755 P.2d 7, 10, 11 (1988); *Scott v. State*, 252 Ga. 251, 313 S.E.2d 87, 88 (1984); *In re Leon*, 122 R.I. 548, 410 A.2d 121, 124, 125 (1980); *Commonwealth v. Bolish*, 381 Pa. 500, 113 A.2d 464, 474 (1955), *overruled on other grounds, Com. ex rel. Shadd v.* *Myers*, 423 Pa. 82, 223 A.2d 296, 298 (1966); *but see People v. Ferlin*, 203 Cal. 587, 265 P. 230, 235 (1928); *State v. Williams*, 254 So.2d 548, 551 (Fla.App.1971), *overruled, State v. Perez*, 382 So.2d 731, 733 (Fla.App.1980).

produce death." While the least egregious arson carries a maximum prison sentence of 10 years, involuntary manslaughter carries a potential prison term of "no more than three years." 18 U.S.C. § 1112.

Second, the Sentencing Commission specially designed the first degree murder guideline, § 2A1.1, to guide district courts in sentencing perpetrators of felonies in which death resulted. Application Note 1 to § 2A1.1 specifies that "this guideline also applies when death results from the commission of certain felonies."[2] It then provides that a downward departure may be appropriate if the killing was not intentional or knowing:

> If the defendant did not cause the death intentionally or knowingly, a downward departure may be warranted. The extent of the departure should be based upon the defendant's state of mind (e.g., recklessness or negligence), the degree of risk inherent in the conduct, and the nature of the underlying offense conduct. However, the Commission does not envision that departure below that specified in § 2A1.2 (Second Degree Murder) is likely to be appropriate.

U.S.S.G. § 2A1.1, Application Note 1.

Finally, we are significantly guided by our decision in *United States v. Paden*, 908 F.2d 1229 (5th Cir.1990), cert. denied, 498 U.S. 1039, 111 S.Ct. 710, 112 L.Ed.2d 699 (1991). In *Paden*, the defendant committed an arson in which a fire fighter died. When the district court applied the arson guideline, § 2K1.4(c)(1), to the defendant Boyd, it determined that the most analogous murder guideline was § 2A1.1. *Paden*, 908 F.2d at 1233, 1238.[3] Because the fire fighter's death was not caused intentionally or knowingly, the court downwardly departed to a base offense level of 33, which corresponds to second degree murder. *Paden*, 908 F.2d at 1233, 1238; See U.S.S.G. § 2A1.1, Application Note 1. We concluded that the district

court's sentence had applied "the literal language of the guidelines," and was therefore not clearly erroneous. *Paden*, 908 F.2d at 1238.

If the district court had correctly applied the cross reference in the arson guideline by choosing § 2A1.1 as the "most analogous guideline from Chapter Two Part A," it would have begun with a base offense level of 43. With an additional two points for El–Zoubi's leadership role in the offense and a criminal history category of I, the sentencing table would have called for life imprisonment. If the district court had then downwardly departed to the limits allowed by Application Note 1 to § 2A1.1 (the base offense level of 33, corresponding to the second degree murder guideline, plus the two points for El–Zoubi's leadership role, and a criminal history category of I), the sentencing table would have called for a sentencing range of 168 to 210 months.

■ Thus, El–Zoubi's sentence of 120 months of imprisonment is substantially lower than the sentence that would have resulted from a correct application of the guidelines. However the government did not cross-appeal, and has therefore waived any challenge to the district court's misapplication of the guidelines in El–Zoubi's favor. *United States v. Turner*, 898 F.2d 705, 711 (9th Cir.), cert. denied, 495 U.S. 962, 110 S.Ct. 2574, 109 L.Ed.2d 756 (1990); *United States v. Bechtol*, 939 F.2d 603, 605 & n. 4 (8th Cir.1991). We therefore affirm El–Zoubi's sentence.

### B.

■ El–Zoubi argues that the evidence does not support a two level increase under U.S.S.G. § 3B1.1 for his leadership role in the offense. When the PSR gave the increase it determined that El–Zoubi "exercised decision making authority, expected to claim the rights to a larger share of the fruits

---

**2.** Before a clarifying change in 1990, the Application Note listed arson and the other felonies enumerated in the felony-murder clause of § 1111(a). Appendix C, amendment 310.

**3.** Although the opinion, at one point, gives the impression that the district court went straight to

the second degree murder guideline, it explains in an earlier section that the district court went to the first degree murder guideline and then downwardly departed to the base offense level corresponding to second degree murder. *Paden*, 908 F.2d at 1233, 1238.

of the crime, and was the major participant in planning and organizing the offense." The PSR relied on evidence that El–Zoubi wrote Adel a $5,000 check. Additionally, it relied on evidence that El–Zoubi made all of the arrangements to procure fire insurance for the market. The district court's agreement with the PSR is not clearly erroneous.

### C.

In light of our disposition of El–Zoubi's sentence, we need not address his remaining two arguments. El–Zoubi contests the district court's conclusion that he could be sentenced to "any term of years." Arson, in violation of 18 U.S.C. § 844(i), normally carries a maximum prison term of "not more than ten years." However the section provides that "if death results to any person . . . as a direct or proximate result" of the offense, the maximum prison sentence goes up to "any term of years." The district court concluded that Adel's death was the death of "any person," within the meaning of § 844(i), and that El–Zoubi was exposed to a prison sentence of "any term of years." El–Zoubi argues that Adel's coconspirator status takes his death out of the contemplation of § 844(i)'s penalty enhancement provision. We need not decide this issue, because El–Zoubi's sentence does not exceed ten years.

El–Zoubi also contends that the district court should have grouped all three of his convictions together for sentencing purposes. Under U.S.S.G. § 3D1.2, the PSR divided the three counts on which El–Zoubi was convicted into two groups. Group one consisted of counts one and three, conspiracy and arson. Group two consisted of counts one and two, conspiracy and mail fraud. The adjusted offense level for group one was 22, while the adjusted offense level for group two was 17. Because group two was "5 to 8 levels less serious" than group one, one level was added to the adjusted offense level for group one, for a total of 23. See U.S.S.G. § 3D1.4(b).

U.S.S.G. § 3D1.4(c) instructs the court to "disregard any group that is 9 or more levels less serious than the group with the highest offense level." As we have explained above, the offense level for group one, calculated correctly, would have been more than 9 levels above the adjusted offense level for group two. See U.S.S.G. §§ 2A1.1, 2A1.2. So the district court's grouping decision will not affect El–Zoubi's sentence. Therefore we need not address the merits of this argument.

### IV.

For the reasons stated above, we affirm El–Zoubi's conviction for conspiracy, mail fraud, and arson. In addition, we affirm the sentence imposed by the district court.

AFFIRMED.