545 So.2d 352 (1989)
Charles HOWARD, Appellant,
v.
STATE of Florida, Appellee.
No. 87-1892.
District Court of Appeal of Florida, First District.
May 23, 1989.
Rehearing Denied July 14, 1989.
Michael E. Allen, Public Defender, Carl S. McGinnes, Asst. Public Defender, for appellant.
Robert A. Butterworth, Atty. Gen., John M. Koenig, Jr., Asst. Atty. Gen., for appellee.
NIMMONS, Judge.
Appellant was charged with third degree murder and possession with intent to sell cocaine. The latter offense was the underlying felony supporting the felony murder charge. Appellant asserts error in the trial court's denial of his motion for judgment of acquittal as to the murder count. He does not, as such, attack the possession count. However, he does contend that he should not be adjudged guilty of both the murder and the underlying possession count, arguing a violation of his right not to be twice placed in jeopardy for the same offense. We affirm.
According to the evidence presented at trial, appellant and the homicide victim, Anthony Sharp, were partners in processing and distributing cocaine. Sheila Perry testified that she had given a key to her trailer to her brother who in turn permitted appellant and Sharp to use the trailer. Approximately one week prior to Sharp's death, Perry discovered appellant and Sharp processing cocaine at her trailer.
Officer Anderson of the Tallahassee Police Department (T.P.D.) testified that on the day of Sharp's death, August 25, 1986, information was received through the Crime Stoppers Line that two black males were selling cocaine out of Room 300 at the Knights Inn motel and that a red Ford Mustang was being used by the suspects. A police surveillance of the motel was set up.
During the surveillance, appellant was observed standing in the doorway of his room for a few moments and then going into the room. Later, police observed *353 Sharp arrive in a red Ford Mustang, exit the automobile, and enter Room 300.
According to Sheila Perry, appellant asked her to come to the Knights Inn motel. When she arrived at the motel, she learned that appellant and Bruce Sanders were staying in one room and Sharp and another person were sleeping in the room next door at the time she was there. Perry observed in appellant's room a red tool box which she said contained crack cocaine and money. Perry departed, giving Bruce Sanders a ride to Havana.
Appellant, Sharp, and Byron Foster were observed removing various items from the room and placing them in the Mustang. One officer specifically identified Sharp as the one who brought the red tool box out of the room and placed it in the trunk of the Mustang after which the three drove away.
As the red Mustang was observed proceeding south on Monroe Street, Officer Anderson requested assistance from uniformed officers in making a traffic stop. Officer Moreau pulled the car over in the drive-through area of McDonald's restaurant on North Monroe Street. Foster was in the driver's seat, appellant was in the front passenger's seat, and Sharp was in the back seat. The three occupants were removed from the Mustang. Foster was allowed to reenter the car and move it to the Northwood Mall parking lot located immediately behind McDonald's.
Appellant and Sharp were placed inside Officer Moreau's car without their being handcuffed. They were driven to the Northwood Mall parking lot. Karen Green, a community service officer with the T.P.D. who was seated in the front seat, testified that appellant asked a question which Green could not understand and Sharp mumbled a reply to appellant. Green observed a tannish-white chalky substance rimming his mouth as if he were chewing something and having difficulty swallowing it. Appellant and Sharp were taken out of the police car and searched. Cannabis was found on Sharp and he was arrested and handcuffed.
Meanwhile, Officer Anderson secured a consent from Foster to search the Mustang. Foster opened the trunk and removed the red tool box. Subsequently, a warrant to search the tool box was obtained. The search of the tool box revealed crack cocaine, scales with weights and balances, several plastic baggies, a package of razor blades, a calculator, and $8,650.00 in cash.
As Sharp was being placed back into the police car, the police noticed that he had something on his mouth and seemed to be eating something, which Sharp said was a breath mint. The police unsuccessfully tried to get Sharp to spit out what he had in his mouth. A rescue unit arrived shortly thereafter and transported Sharp to the hospital where he was pronounced dead.
Officer Dent testified that, while searching appellant, Dent searched one of appellant's shoes, finding nothing. Appellant would not allow his other shoe to be searched. As appellant was reentering the police car, Dent saw him reach in the area of his shoe and saw two keys clutched in his hand. Appellant refused to open his hand. As he placed his hand to his mouth, the officers grabbed him and arrested and handcuffed him. No keys were found.
In searching the Mustang, the officers found in the back seat a plastic baggie, a corner of which appeared to have been bitten off. Although the baggie was basically empty, there was a residue of cocaine in it.
A duffle bag was found in the trunk of the car. Inside was a matchbox containing four razor blades and traces of cocaine. Also found in another duffle bag in the back seat was a receipt for lodging at the Knights Inn. In a search of Room 300 and the adjacent room at the Knights Inn, officers found a soft drink can and a beer can, both of which had been converted to crack pipes bearing cocaine residue. No testimony regarding fingerprints with respect to these items was presented.
Appellant's fingerprints were found on the outside of the red tool box and on some items inside the box. No other prints were identified as coming from any other people, *354 although the prints were compared with those of Sharp and others.
A pathologist testified that Sharp died from massive cocaine ingestion. The substance which was wiped from Sharp's mouth area was identified as cocaine residue.
Byron Foster's cousin, Vernon Lamb, was the owner of the red Mustang. At the time of trial, Foster was apparently at parts unknown and did not testify.
The defense rested without presenting any evidence. As earlier noted, the jury returned a verdict of guilty as charged  third degree murder and possession with intent to sell cocaine. Also as earlier noted, appellant does not contest the sufficiency of the evidence to support the cocaine possession count.
Third degree murder is defined in Florida as
(4) The unlawful killing of a human being, when perpetrated without any design to effect death, by a person engaged in the perpetration of, or in the attempt to perpetrate, any felony other than [those specified in Section 782.04(1)(a)2.]... .
Section 782.04(4), Florida Statutes (1985).
The theory of the state's case was that both appellant and Sharp were engaged in the perpetration of the underlying felony of possession with intent to sell cocaine at the time of Sharp's death and that neither the fact that Sharp killed himself (as opposed to a bystander or third party) nor the fact that appellant was not in actual possession of the cocaine ingested by Sharp absolves appellant from guilt under the above statute. We agree.
In our legal analysis of this case, we think it useful to briefly mention related scenarios in determining whether the subject statute contemplates the kind of situation involved in the instant case. For example, assume A is in possession of a quantity of cocaine with intent to sell. He meets with B (a prospective buyer) in order to consummate the transaction. A unholsters his handgun which he carries for security purposes during such transactions. While discussing the drug buy with B, A's gun accidentally discharges, killing B. This would be an obvious case for the application of the third degree murder statute. A's otherwise innocent act  an accidental killing  is rendered third degree murder because of his commission of the underlying drug offense.
Let us add a co-felon, or accomplice, to the above scenario. X and Y are partners in distributing cocaine. Together, they process and package a quantity of cocaine in a motel room, load it up in their vehicle and transport it across town with the intent to distribute it to unknown persons but are intercepted by the police. During the drug arrest, Y's gun accidentally discharges and kills Z, one of the arresting officers. X is guilty of third degree murder even though he did not commit the act of killing and even though the shooting was not intended. Y's act of killing is imputed to X simply because of the law of principals, while the underlying drug offense committed by both X and Y renders the accidental killing third degree murder.
Among the principal questions presented by this case are: (1) Does it matter that it is one of the co-felons who is killed, by his own hand; and (2) Is the statute inapplicable where the killing occurs after the appellant and his co-felons have been taken into custody?
With respect to the first question, it should make no difference in this case that appellant's co-felon died at his own hand. Under the applicable authorities, Sharp's act which resulted in his death, must have been committed in furtherance of the common criminal scheme, or as a probable, predictable, reasonably foreseeable, or causally connected result of the underlying felony. See State v. Amaro, 436 So.2d 1056, 1061 (Fla. 2nd DCA 1983); Garcia v. State, 439 So.2d 328 (Fla. 3rd DCA 1983) (the act must not be one independent from the underlying felony). It is entirely foreseeable by those involved in illicit drug transactions that their accomplices may try to secrete or destroy the substance by placing it in the mouth or other body orifice. Indeed such has become fairly commonplace. *355 As noted by this court in Adams v. State, 523 So.2d 190, 193 (Fla. 1st DCA 1988):
Officer Ethridge had probable cause to believe a crime was being committed and he had probable cause to believe that Adams was hiding evidence of that crime in his mouth. If he had not forced Adams's mouth open, Adams easily could have swallowed the cocaine, resulting in the destruction of the evidence and, quite possibly, Adams's death.
What about the appellant's assertions that Sharp's death cannot be deemed to have occurred during the perpetration of the underlying drug offense because both appellant and Sharp were in police custody? This is a good question and one which has caused us concern. State v. Amaro, supra, is instructive on this question.
In Amaro, the issue presented was whether the defendants who were apprehended for a drug offense could be held responsible for their co-felon's fatally shooting a police officer in the course of the co-felon's attempt to avoid apprehension. As in the subject case, the defendants (Amaro, Rodriguez and Villegas) were charged with third degree murder under Section 782.04(4). The trial court granted the defendants' 3.190(c)(4) motion to dismiss. The trial court's decision turned on the fact that Amaro and Villegas were under arrest when the officer was killed and the fact that the third defendant, Rodriguez, was either under effective arrest or was incapacitated by the first set of shots fired by Bello (the accomplice who actually shot the officer). And so the principal issue before the Second District was the effect of the arrest of Amaro and Villegas, and the arrest or incapacitation of Rodriguez, on their liability for third degree murder.
The Second District, in reversing the order of dismissal, stated:
All three appellees were alleged to be willing participants in the underlying felonies: possession and delivery of cannabis. They are responsible for the results which came about from the forces which they set in motion. When Detective Rauft was killed, the episode was still evolving. Until the scene of the crime, and the participants, were controlled and secured by the officers, the underlying felony had not terminated. Bello's shooting of the firearm was a part of the attempt to escape apprehension. The fact that the appellees were each under some form of detention, or were being held at bay by the police, or were incapacitated, will not work to absolve appellees from liability for felony murder. The legal fiction urged by appellees, that arrest terminates participation in the underlying felony and prevents liability for a further act of a co-felon, will not serve to ignore the realities and practicalities of the situation. To hold otherwise would be in contravention of the established law and would reward appellees for the fortuitous occurrence of their arrest while the situation was developing and the scene unsecured. [footnote omitted]
436 So.2d at 1061.
Of course, the killing involved in Amaro occurred while the co-felon was engaged in an effort to elude apprehension. We do not perceive this to be a material distinction from the subject case. In fact, it appears to us that the efforts of appellant's co-felon (Sharp) to secrete or destroy evidence might appropriately be regarded  at least for purposes of the issue before us  as the functional equivalent of Bello's attempt in Amaro to elude apprehension. Moreover, as is evident from the factual narrative set forth in the early part of this opinion, it can fairly be said that the officers were still in the process of securing the scene and the three suspects when Sharp attempted to secrete or destroy the evidence.
We, therefore, are not persuaded that the following footnote observation in Amaro would suggest a different result in our case:
Note that the result might have been different if Bello was `holed up' in the bedroom for some longer period of time and the appellees were securely in custody, either in a jail cell, in a squad car, or *356 perhaps even in handcuffs. However, this is not the situation here and, thus, is left for another day. (emphasis in original)
436 So.2d at 1061, 1062, f.n. 5.
We would add that, in a sense, it would seem even more fair to saddle appellant in our case with the consequences of co-felon Sharp's act than visiting the consequences of Bello's act upon the defendants in Amaro. For in Amaro, Bello's act of attempting to elude the police was one which could hardly be seen as having any anticipated benefit to the defendants. On the other hand, Sharp's act of attempting to secrete or destroy the baggie of cocaine might well be viewed as a means by which both Sharp and his co-felons could, if successful, avoid a search of the trunk and discovery of the additional cocaine in the tool box.
We now turn to another question. Appellant contends that the state failed to prove a causal relationship between Sharp's death and appellant's commission of the underlying offense of possession with intent to sell cocaine, an essential element of the offense of third degree murder as recognized in Bryant v. State, 412 So.2d 347 (Fla. 1982).[1] Specifically, appellant says that such causal relationship is absent because the evidence proved that appellant was in possession of only the cocaine contained in the red tool box, but that there was no proof that the appellant possessed the cocaine which Sharp ingested.[2] We think appellant is splitting hairs.
Assuming, without deciding, that, in order to prove the requisite causal relationship contemplated by Bryant, the state had the burden of proving that appellant had possession of the very cocaine ingested by Sharp, we believe that the evidence was sufficient to establish at least constructive possession by both appellant and Sharp of all the cocaine which was situated in the Mustang, including that which Sharp placed in his mouth. As earlier mentioned in our opinion, the evidence showed that appellant and Sharp were partners in processing and distributing cocaine. That is apparently what they were doing at the Knights Inn motel shortly before they transferred the cocaine to the Mustang. In fact, one of the surveillance officers actually saw Sharp carrying the cocaine-laden tool box and placing it in the Mustang shortly before their encounter with the police. To suggest that the trier of fact would be precluded from finding that the cocaine which Sharp was attempting to secrete or destroy came from that which appellant and Sharp jointly possessed would stretch credulity.
In his second issue, appellant contends that the trial court erred in imposing judgment and sentence for both third degree murder and the underlying felony, possession with intent to sell cocaine. Appellant relies upon a Carawan analysis.[3] However, in the post-Carawan case of LeCroy v. State, 533 So.2d 750 (Fla. 1988), the Supreme Court recently reconfirmed its earlier decision in State v. Enmund, 476 So.2d 165 (Fla. 1985), wherein the Court specifically approved separate judgments and sentences for felony murder and the underlying felony.
AFFIRMED.
BARFIELD and MINER, JJ., concur.
NOTES
[1] See also Gomez v. State, 496 So.2d 982 (Fla. 3rd DCA 1986) (failure to establish a causal relationship between the homicide and the underlying felony, robbery).
[2] At oral argument, counsel for appellant conceded that he would have no argument if the evidence showed that the cocaine ingested by Sharp had been situated on the car seat between appellant and Sharp.
[3] Carawan v. State, 515 So.2d 161 (Fla. 1987).