United States Court of Appeals,

Eleventh Circuit.

No. 95-9533.

UNITED STATES of America, Plaintiff-Appellee,

v.

Andy THAM, Defendant-Appellant.

Aug. 11, 1997.

Appeal from the United States District Court for the Middle District of Georgia. (No. 5:94-CR-80-DF), Duross Fitzpatrick, Judge.

Before BLACK, Circuit Judge, and FAY and ALARCON[*], Senior Circuit Judges.

BLACK, Circuit Judge:

In August of 1995, a federal jury convicted Appellant Andy Tham of arson, mail fraud, and conspiracy to commit each of those substantive offenses. Pursuant to a cross-referencing provision contained in the arson sentencing guideline, the district court calculated Tham's sentence in accordance with the first-degree murder sentencing guideline because the arson resulted in the death of a cofelon. On appeal, Tham asserts that the district court erred by admitting into evidence involuntary or coerced statements and by denying his motions for judgment of acquittal. Tham also assigns error to the district court's determination that his arson sentence must be determined with reference to the first-degree murder sentencing guideline. We affirm Tham's convictions and sentence.

I. *BACKGROUND*

In January of 1993, Appellant Andy Tham decided to open an elegant Chinese restaurant in Macon, Georgia, with his wife, Judy, and his brother, Tony. In pursuit of this objective, the Tham brothers established a closely-held corporation that would own the restaurant, with each brother holding fifty percent of the outstanding shares. The principals agreed that Andy Tham would serve as president of the corporation, Tony Tham as the vice-president, and Judy Tham as the

---

[*]Honorable Arthur L. Alarcon, Senior U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

secretary-treasurer. To finance the operation, the Tham brothers contributed $50,000 of their own funds.

The Thams subsequently leased the building that would become the Fortune Garden restaurant and initiated the costly renovation process. The lease entered into obligated the Tham brothers to make payments of $2,250 each month for the next three years. The agreement also specified that the entire amount owed under the lease agreement would become immediately due and payable in the event of a default. An escape clause provided that total destruction of the premises by fire or other casualty would terminate the lease, however, leaving the tenant liable for rent only up to the time of the destruction.

Viewed most favorably to the jury's verdict, the evidence adduced at trial demonstrated that financial difficulties beset the Thams' business venture from its inception. In April, the first month the Thams were required to pay rent under their lease agreement, Judy Tham wrote the lessor requesting a reduction in rent. Judy Tham enclosed with the request a check for $1,150, approximately one half the agreed upon monthly rate. After the lessor refused the request, the Thams eventually paid the remainder of their April rent. To sustain their business, however, the Thams were forced to borrow $20,000 from the bank and additional funds from relatives.

By June of 1993, the strain associated with the struggling enterprise caused the principals in the Fortune Garden restaurant to squabble amongst themselves. The acrimony prompted Judy Tham to resign from the corporation and to cease working at the Fortune Garden on June 15, 1993. A few months later, Judy further disassociated herself from the business when she divorced Andy Tham.

From June through October of 1993, the financial condition of the restaurant deteriorated steadily. The restaurant consistently failed to pay its rent on time. In July of 1993, the Fortune Garden's rent check was returned for insufficient funds. In October of 1993, the restaurant proved unable to pay its rent at all. At approximately the same time, Fortune Garden stopped making timely payments to its poultry supplier. The delinquency led the poultry supplier to revoke Fortune Garden's credit privileges. By October 31, 1993, Fortune Garden owed the poultry supplier $3,000.

Indeed, the restaurant's financial predicament proved so severe that the Tham brothers found it necessary to suspend their own salaries and live off borrowed funds.

On October 31, 1993, Andy Tham, Tony Tham, Loni Tham (Tony's wife), and Simon Lee Kwong[1] closed the Fortune Garden restaurant for the night. After closing the restaurant, Appellant Tham visited his ex-wife at her apartment. Shortly after midnight, Andy Tham borrowed his ex-wife's car for the ostensible purpose of retrieving some movies from his brother's apartment. Appellant Tham indicated to his ex-wife that he would return to her apartment later to watch the movies. Andy Tham then proceeded to his brother's apartment where he spent several hours in the company of his brother and Simon Kwong.

At approximately 2:00 a.m., Andy Tham, Tony Tham, and Simon Kwong drove Tony Tham's automobile to the Fortune Garden restaurant. Andy Tham dropped Tony Tham and Simon Kwong off at the restaurant and then continued down the road to a Kroger market four-tenths of a mile away. Andy Tham circled the parking lot repeatedly before stopping in front of the market.

At 2:18 a.m., the 911 emergency service in Macon received a call reporting a fire at the Fortune Garden. Shortly thereafter, two badly burned individuals, later identified as Tony Tham and Simon Kwong, entered the Kroger shouting that they had been kidnaped. Kroger employees detected an odor of gasoline emanating from their charred figures. A Kroger employee placed a 911 call to report the incident. Andy Tham then entered the Kroger store and asked the two burned men what had happened.

Moments later, police and medical personnel arrived at the scene. The fire department also arrived and managed to subdue the blaze at the Fortune Garden, but not before it had consumed the building. Meanwhile, the burned men were transported to local hospitals by ambulance and then transferred to the burn center in Augusta, Georgia. Tony Tham ultimately died from his burns. Simon Kwong survived, but suffered severe disfiguration.

---

[1]Tony Tham had befriended Kwong when the two had lived in California. After his arrival in Macon, approximately two weeks earlier, Kwong had stayed with Tham. According to the evidence presented at trial, Kwong had traveled to Macon to be "trained" as a busboy, but received no compensation for his efforts.

Expert witnesses subsequently determined that the fire at the Fortune Garden had been intentionally set by spreading gasoline around the interior of the restaurant. The fire apparently started prematurely, however, when the pilot light on the water heater came into contact with the gasoline vapors. At that point, a fireball flashed through the restaurant, sending the internal temperature to between 900 and 1200 degrees Fahrenheit within 60 seconds. The United States also presented evidence that the clothing of both Tony Tham and Simon Kwong contained liquid gasoline and gasoline vapors. In addition, police officers recovered a Bic lighter from Simon Kwong's pant pocket.

Law enforcement officials commenced their investigation immediately after arriving at the scene of the fire. Macon Police Department Officer Carolyn Marion first questioned Appellant Tham shortly after her arrival at 2:34 a.m. At that time, Appellant Tham told Officer Marion that he had taken two of his employees to the restaurant to work the "midnight shift." Appellant Tham explained that after dropping the employees off at the restaurant, he went to the Kroger, returned to the restaurant, then saw that the building was on fire. Approximately 15 to 20 minutes later, Appellant Tham again spoke with Officer Marion in the Kroger parking lot. On this occasion, Tham stated that he went home after dropping his employees off at the restaurant. Appellant Tham indicated that he then decided to come back to the Kroger, where he encountered his two burned employees.

Subsequently, Officer Bennie Gibson arrived at the Kroger parking lot. Officer Gibson also attempted to interview Tham, but could not understand the language Tham started to speak. Officer Gibson told Tham that if he was not able to speak in a way that he could understand, he would "take him down to the jail where we could talk." Appellant Tham then resumed speaking in comprehensible English. Officer Gibson then asked Tham why he had been circling the Kroger parking lot prior to the fire. Appellant Tham responded that someone had called him to request a ride. Without eliciting any further comments from Tham, Officer Gibson turned the investigation over to detectives of the Macon Police and Fire Departments.

During a subsequent interview with a fire investigator, Tham indicated that he needed to

inform Tony Tham's wife about the fire. The officers on the scene arranged for Andy Tham to be escorted in a police cruiser to his sister-in-law's residence. The officers then apparently brought Andy Tham and his sister-in-law back to the Kroger market.

Eventually, Macon Police Department Detective Robert Robinson assumed control of the arson investigation. In response to questions posed by Detective Robinson, Tham now indicated that he had dropped his brother and Simon Kwong off at work, went home to eat, and then came back to Kroger to get something to drink. When Detective Robinson expressed surprise that Tham would travel to Kroger to get something to drink when his own restaurant was right down the road, Tham explained that he wanted a Coke and his restaurant only served Pepsi.

Appellant Tham subsequently agreed to continue the interview at the Macon Police Department. In accordance with standard procedures, an officer advised Tham of his *Miranda* rights at the time of his arrival. The Police Department also summoned the owner of a local Chinese restaurant to act as an interpreter for Tham. During this interview, Tham claimed that after he dropped his brother and Kwong off at the restaurant, he returned home to retrieve his wallet, not to get something to eat. Detective Robinson also questioned why Tham had parked in the middle of an empty parking lot during the early morning hours. Appellant Tham replied that he had parked there in order to count his money. After responding to a few additional questions, however, Appellant Tham terminated the interview when he announced that he wanted an attorney. At that time, all questioning ceased and Tham left the Police Department.

In January of 1994, Appellant Tham signed and mailed a proof of loss form to Kaplan-Treusdel Insurance Company. In a sworn statement provided in connection with the ensuing insurance investigation, Appellant Tham further altered his explanation of events on the morning of the fire. In particular, Tham now claimed that he had traveled to Kroger in the middle of the night not to buy a Coke, but to purchase meat and garnishes for the restaurant.

On February 22, 1995, a federal grand jury issued a superseding indictment charging Appellant Tham with conspiracy to commit arson and mail fraud in violation of 18 U.S.C. § 371, arson in violation of 18 U.S.C. § 844(i), and mail fraud in violation of 18 U.S.C. § 1341. The United

States District Court for the Middle District of Georgia commenced a jury trial on August 14, 1995. Three days later, the jury convicted Appellant Tham on all three counts. On November 17, 1995, the district court sentenced Tham to 168 months' imprisonment on the arson count. The court also imposed concurrent sentences of 60 months' imprisonment each for the conspiracy and mail fraud counts. On December 4, 1995, Appellant Tham filed a timely notice of appeal challenging his convictions and sentence.

## II. *DISCUSSION*

Although Tham raises three issues on appeal, only his sentencing claim merits extended discussion.[2] Tham challenges the sentence imposed by the district court for his arson conviction. In calculating the appropriate sentencing range for that conviction, the district court first consulted the United States Sentencing Guideline § 2K1.4, the provision applicable to arson and property damage caused by use of explosives. Section 2K1.4 specifies a base offense level of either 20 or 24 if the offense "created a substantial risk of death or serious bodily injury to any person other than a participant in the offense," the precise level dependent upon whether the perpetrator knowingly created the risk of harm. U.S.S.G. § 2K1.4(a)(1)-(2). The guideline also prescribes a base offense level of 20 if the offense "involved the destruction or attempted destruction of a structure other than a dwelling." U.S.S.G. § 2K1.4(a)(2)(B). Appellant Tham contends that the district court should have sentenced him under one of these provisions, which would have resulted in a significantly lower sentencing range.

Instead, the district court determined that a cross-referencing provision in the arson

---

[2]We affirm without elaboration the district court's admission of statements made by Andy Tham on the morning of the fire because those statements were not the product of a custodial interrogation or coercive police activity. *See Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986) (recognizing that coercive police activity is a necessary predicate to finding that incriminating statements are not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment); *Minnesota v. Murphy,* 465 U.S. 420, 430, 104 S.Ct. 1136, 1144, 79 L.Ed.2d 409 (1984) (holding in the *Miranda* context that a suspect is not "in custody" unless the restrictions on his freedom of movement is "of the degree associated with a formal arrest"). We also affirm the district court's determination that the evidence presented was sufficient to permit a rational jury to find the essential elements of each crime charged beyond a reasonable doubt. *See United States v. Saget,* 991 F.2d 702, 711-12 (11th Cir.), *cert. denied,* 510 U.S. 950, 114 S.Ct. 396, 126 L.Ed.2d 344 (1993).

sentencing guideline applied to Tham's conviction. Subsection (c) of the arson sentencing guideline provides that "[i]f death resulted, ... apply the most analogous guideline from Chapter Two, Part A (Offenses Against the Person) if the resulting offense level is greater than that determined above." U.S.S.G. § 2K1.4(c). The district court selected § 2A1.1, the first-degree murder sentencing guideline, as the most analogous guideline because the commentary to that section refers to the federal felony murder statute. Among the offenses comprehended by the federal felony murder statute is "murder ... committed in the perpetration of, or attempt to perpetrate, any arson." 18 U.S.C. § 1111.

The first-degree murder sentencing guideline prescribes a base offense level of 43. U.S.S.G. § 2A1.1(a). The district court may grant a downward departure "[i]f the defendant did not cause the death intentionally or knowingly," but departure below the base offense level of 33—the level associated with second-degree murder—is not likely to be appropriate. U.S.S.G. § 2A1.1, comment. (n.1). The district court therefore granted Tham an eight-level downward departure to reflect its determination that Tham had not intentionally caused the death of his brother. The resulting offense level of 35, when combined with Tham's criminal history category, yielded a sentencing range of 168 to 210 months. The district court then sentenced Tham to 168 months' imprisonment.

A. *The Applicability of the Cross-referencing Provision.*

As an initial matter, Tham contends that the district court erroneously invoked the cross-referencing provision in the instant case. *See* Appellant's Brief at 33 (arguing that the district court should have employed the offense level for arson instead of the offense level for homicide). Although the cross-referencing provision of the sentencing guideline for arson directs district courts to apply the most analogous guideline concerning offenses against the person "[i]f death resulted," U.S.S.G. § 2K1.4(c), Tham intimates that we should interpret this subsection to require that the referenced death befall someone "other than a participant in the offense." If we were to accept the construction urged by Tham, his brother's participation in the underlying arson would render the cross-referencing provision inapplicable.

In accordance with well-established rules, the language of the Sentencing Guidelines is to

be given its plain and ordinary meaning. *United States v. Pompey,* 17 F.3d 351, 354 (11th Cir.1994); *United States v. Strachan,* 968 F.2d 1161, 1163 (11th Cir.1992) (referencing the "wealth of precedent in this circuit that seeks to remain faithful to the plain language of the sentencing guidelines"); *United States v. Wilson,* 993 F.2d 214, 217 (11th Cir.1993) (indicating that sentencing guideline commentary must be given its plain and ordinary meaning). In the instant case, this canon of construction militates against acceding to Tham's request that we imply an exception to the cross-referencing provision for the death of a coparticipant. The sentencing guideline unambiguously commands district courts to employ the cross-referencing provision whenever death results, not merely when death results to a certain subset of potential victims.

Moreover, the text of a subsection preceding the cross-referencing provision confirms that the drafters of the Sentencing Guidelines intended for the provision to apply to any death that resulted from perpetration of the arson. Specifically, subsection 2K1.4(a)(1) provides for an elevated base offense level if the arson "created a substantial risk of death or other serious bodily injury to *any person other than a participant in the offense.*" U.S.S.G. § 2K1.4(a)(1)-(2) (emphasis added). By contrast, the arson cross-referencing provision directs district courts to apply the most analogous guideline concerning offenses against the person if "death resulted" from perpetration of the arson, without regard to the identity of the individual killed. As the drafters of the Sentencing Guidelines included the "other than a participant" language in one subsection of U.S.S.G. § 2K1.4, but omitted that same language from the cross-referencing provision, we presume the disparate inclusion or exclusion represents an intentional and purposeful act. *See Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) (applying this rule relative to statutory construction); *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir.1972) (per curiam) (same). If the drafters of U.S.S.G. § 2K1.4 had intended to restrict the scope of the cross-referencing provision to arsons resulting in the deaths of nonparticipants, they undoubtedly would have done so expressly by incorporating the same language employed in the immediately preceding subsection. Consistent with the plain and ordinary meaning of the language employed, we therefore hold that § 2K1.4 requires cross-referencing even when death befalls a participant in the arson.

In reaching the foregoing conclusion, we are mindful that courts need not effectuate the plain meaning of a guideline in those extraordinary instances when the language produces an absurd result contrary to the drafters' manifest intent. *United States v. Shenberg,* 89 F.3d 1461, 1475 (11th Cir.1996), *petition for cert. filed,* 65 U.S.L.W. 3468 (Dec. 23, 1996) (No. 96-1009); *see also United States v. McLymont,* 45 F.3d 400, 401 (11th Cir.) (per curiam) (applying same principle in the statutory context), *cert. denied,* 514 U.S. 1077, 115 S.Ct. 1723, 131 L.Ed.2d 581 (1995); *United States ex rel. Williams v. NEC Corp.,* 931 F.2d 1493, 1498 (11th Cir.1991) (same). The principle simply has no application in the present circumstances. No anomaly inheres in the drafters' refusal to enhance a sentence based upon the risk of death to arson participants when the danger does not materialize, *see* U.S.S.G. § 2K1.4(a), and their willingness to enhance the sentence when the danger does materialize, *see* U.S.S.G. § 2K1.4(c).[3] Distinctions based on the consequences of a criminal act, as opposed to the intentions of the actor, represent an enduring and pervasive characteristic of the moral thought that informs our system of criminal law. *See United States v. Martinez,* 16 F.3d 202, 206 (7th Cir.) (Posner, C.J.) (noting that a speeding motorist who hits no one is guilty of no more than a highway code violation, but the same motorist who hits a child is guilty of involuntary manslaughter), *cert. denied,* 513 U.S. 886, 115 S.Ct. 226, 130 L.Ed.2d 152 (1994); Kevin Cole, *Killings During Crime: Toward a Discriminating Theory of Strict Liability,* 28 Am.Crim. L.Rev. 73, 74 (1990) ("[S]pecific statutes typically penalize mere risk creation at a lower level than that same risk creation when death results."). We therefore reject any contention that effectuating the plain meaning of the cross-referencing provision would produce an absurd result.

B. *Selection of the Most Analogous Sentencing Guideline.*

Even if the district court properly invoked the cross-referencing provision, Tham contends

---

[3]The drafters evidently reject the risk to arson participants as a valid basis for sentence enhancement because arson is considered inherently dangerous to the arsonist. *United States v. Martinez,* 16 F.3d 202, 205 (7th Cir.), *cert. denied,* 513 U.S. 886, 115 S.Ct. 226, 130 L.Ed.2d 152 (1994). An inherent, as distinguished from a contingent, characteristic of an offense cannot be used to pick out an aggravated version of the offense. *United States v. Lallemand,* 989 F.2d 936, 939-40 (7th Cir.1993). By contrast, endangerment of nonparticipants is not considered inherent in arson, so the existence of such a risk boosts the base offense level. *See Martinez,* 16 F.3d at 205.

the court erroneously analogized the underlying arson to first-degree murder merely because the first-degree murder guideline comprehends felony murder. Appellant Tham considers the felony murder analogy inappropriate for two reasons. First, Tham contends that felony murder requires "malice aforethought" with respect to the individual killed, not merely a death associated with the underlying felony. Tham therefore insists that he did not possess the requisite state of mind relative to the death of his brother. Second, Tham claims the federal felony murder statute has no application to the accidental, self-inflicted killing of a coconspirator resulting from perpetration of an enumerated felony. We reject each of Appellant Tham's proffered distinctions.[4]

1. *The Malice Aforethought Requirement.*

The federal felony-murder statute provides in relevant part: "Murder is the unlawful killing of a human being with malice aforethought. Every murder ... committed in the perpetration of, or attempt to perpetrate, any arson ... is murder in the first degree." 18 U.S.C. § 1111(a). The statute reflects the English common law principle that one who caused another's death while committing or attempting to commit a felony was guilty of murder even though he did not intend to kill the deceased. *United States v. El-Zoubi,* 993 F.2d 442, 449 (5th Cir.1993); Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 7.5 (1986); 40 Am.Jur.2d *Homicide* § 72 (1968). The theory of the common law was that anyone who committed a common law felony possessed legal malice. *Commonwealth v. Bolish,* 381 Pa. 500, 510, 113 A.2d 464, 470 (1955), *overruled on other grounds by Commonwealth ex rel. Shadd v. Myers,* 423 Pa. 82, 223 A.2d 296 (1966). Consequently, anytime commission of a felony caused a death, even though unintentional or

---

[4]Although not of significance in the instant case, we cannot agree with Appellant Tham's assumption that the guideline selected must be perfectly analogous in every respect. As the directive of § 2K1.4 is to use the most analogous guideline from Chapter Two, Part A, the district court need not search for an exact match between the conduct underlying the conviction and the conduct covered by a guideline in Chapter Two, Part A. *United States v. Prevatte,* 16 F.3d 767, 780 (7th Cir.1994). As a result, to establish that the district court erred in imposing a sentence by reference to the first-degree murder sentencing guideline, it would not be sufficient for Tham to identify any distinction between the offense of conviction and the offense referenced by the guideline. Instead, Appellant Tham would have to demonstrate that some other guideline in Chapter Two, Part A was more analogous to the offense of conviction than the guideline selected by the district court. Rather than attempt to shoulder this burden, Appellant Tham blithely states that no guideline in Chapter Two, Part A would be analogous.

accidental, the legal malice from the felony sufficed to transform the killing into a felony murder. *Id.*

Section 1111(a) enshrines this common law principle in federal statutory law, but restricts its application to arson and certain other enumerated felonies. *United States v. Herman,* 576 F.2d 1139, 1143-44 & n. 2 (5th Cir.1978). Accordingly, to be guilty of first-degree murder by virtue of the federal felony murder rule, the defendant need only have intended to commit the underlying felony; no other mens rea is required. *United States v. Flores,* 63 F.3d 1342, 1371 (5th Cir.1995), *cert. denied,* --- U.S. ----, 117 S.Ct. 87, 136 L.Ed.2d 43 (1996); *United States v. Chischilly,* 30 F.3d 1144, 1159-60 (9th Cir.1994), *cert. denied,* 513 U.S. 1132, 115 S.Ct. 946, 130 L.Ed.2d 890 (1995); Cole, *supra,* at 74; *see also United States v. Antelope,* 430 U.S. 641, 644, 97 S.Ct. 1395, 1397-98, 51 L.Ed.2d 701 (1977) (recognizing that the felony murder component of 18 U.S.C. § 1111 does not require proof of premeditation or deliberation). That the killing resulted from commission of an enumerated felony suffices to establish the requisite malice aforethought. *See United States v. Thomas,* 34 F.3d 44, 48-49 (2d Cir.), *cert. denied,* 513 U.S. 1007, 115 S.Ct. 527, 130 L.Ed.2d 431 (1994).

We therefore hold that the malice aforethought requirement poses no impediment to sentencing Appellant Tham with reference to the first-degree murder sentencing guideline. Although the district court concluded that Tham did not intend to cause the death of his brother, the evidence presented at trial persuaded the jury that Tham intended to commit the arson that claimed his brother's life. The malice that motivated commission of the arson also supplies the malice aforethought required for a conviction under the federal felony-murder statute.

2. *Applicability of the Federal Felony Murder Statute to the Death of a Coconspirator.*

In his final challenge to the sentence imposed by the district court, Appellant Tham argues that the federal felony-murder statute represents an imperfect analog to the crime for which he was convicted because the felony-murder statute has no application to the accidental, self-induced death

of a coconspirator.[5] The relevance of the decedent's participation in the underlying felony to the application of the federal felony murder statute presents an issue of first impression within this Circuit. The issue has been squarely confronted by two of our sister circuits, however, and each has concluded that the statute applies to situations in which an arsonist's accomplice dies during the commission of the underlying felony. *See United States v. Martinez,* 16 F.3d 202, 207 (7th Cir.1994) ("The better rule, hence the one we would hope to see adopted in cases under the federal felony murder statute, is that the death of a felon, whether by his own hand or that of another felon, in the course of any of the felonies (including arson) listed in the statute, is a felony murder."), *cert. denied,* 513 U.S. 886, 115 S.Ct. 226, 130 L.Ed.2d 152 (1994); *United States v. El-Zoubi,* 993 F.2d 442, 449 (5th Cir.1993) ("The language of § 1111 is broad enough to include cases in which an arsonist's accomplice dies during the commission of the felony."). Moreover, a host of state courts have reached the same conclusion with regard to interpretation of their state felony murder statutes. *See, e.g., Mikenas v. State,* 367 So.2d 606, 608-09 (Fla.1978) (per curiam); *Howard v. State,* 545 So.2d 352, 354 (Fla.App.1989); *Scott v. State,* 252 Ga. 251, 251-52, 313 S.E.2d 87, 88 (1984); *State v. Hoang,* 243 Kan. 40, 42-46, 755 P.2d 7, 9-11 (1988); *State v. Morran,* 131 Mont. 17, 35-36, 306 P.2d 679, 689 (1957); *State v. Sotteriou,* 132 N.J.Super. 403, 334 A.2d 47, 50 (1975); *Commonwealth v. Bolish,* 381 Pa. 500, 113 A.2d 464, 470-75 (1955), *overruled on other grounds by Commonwealth ex rel. Shadd v. Myers,* 423 Pa. 82, 223 A.2d 296 (1966); *In re Leon,* 122 R.I. 548, 554-55, 410 A.2d 121, 125 (1980). On the other hand, some state courts distinguish between the case in which the accidental death of the felon is self-inflicted and the case in which he is killed by a cofelon, reasoning that the first case does not involve a homicide at all and so cannot be the basis of a charge of felony murder. *State v. Perez,* 382 So.2d 731, 733 (Fla.Dist.Ct.App.1980) (per

---

[5]For the sake of clarity, we note that the evidence does not compel the conclusion that Tony Tham directly caused his own death. It is equally possible that Tham's death resulted from actions taken by coparticipant Simon Kwong. For example, it might have been Kwong, not Tony Tham, who spread gasoline near the pilot light for the water heater, thereby triggering the explosion that sparked the deadly fire. We need not explore this point further, however, because we conclude that the federal felony murder statute provides the closest analog to the crime for which Appellant Tham was convicted even if it could be shown that Tony Tham's death was self-induced.

curiam); *People v. Antick,* 15 Cal.3d 79, 90-92, 123 Cal.Rptr. 475, 482-83, 539 P.2d 43, 50-51 (1975); *People v. La Barbera,* 159 Misc. 177, 180-81, 287 N.Y.S. 257, 262-63 (N.Y.Sup.Ct.1936). As we perceive no principled basis for this distinction, we concur with those courts that hold a felony murder conviction may be predicated upon the death of a coparticipant that results from commission of an enumerated felony, without regard to whether the death was in some sense self-inflicted.

As an initial matter, the text of the federal felony murder statute provides not the slightest indication that Congress intended to restrict its application to cases in which nonparticipants perish as a result of the commission of the felony. To the contrary, the statute flatly proscribes the "unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111. The language of the statute thus sweeps broadly enough to encompass the situation in which an arsonist's accomplice dies as a result of the commission of the felony since culpability for the underlying arson imbues any resulting death with malice aforethought. *See El-Zoubi,* 993 F.2d at 449.

The interpretation of 18 U.S.C. § 1111 that we adopt has the added virtue of promoting the policy rationale most frequently associated with the felony murder rule. Although often skeptical of the wisdom of the felony murder rule, courts and commentators generally agree that the rule was conceived to deter the commission of certain dangerous felonies. *See, e.g., People v. Washington,* 62 Cal.2d 777, 781, 44 Cal.Rptr. 442, 445, 402 P.2d 130, 133 (1965) (noting that the original purpose of the felony-murder rule was to deter felons from killing negligently or accidentally by holding them strictly liable for the killings that are the result of the felony or an attempted one); *Jenkins v. State,* 230 A.2d 262, 268-69 (Del.1967) ("The only rational function of the felony-murder rule is to furnish an added deterrent to the perpetration of felonies which, by their very nature or by the attendant circumstances, create a foreseeable risk of death."); *State v. Hoang,* 243 Kan. 40, 42, 755 P.2d 7, 8 (1988) ("The purpose of the felony-murder doctrine is to deter all those engaged in felonies from killing negligently or accidentally."); Cole, *supra,* at 98 ("The most common defense of the felony-murder rule has rested on deterrence notions."); James J. Tomkovicz, *The Endurance of the Felony-Murder Rule: A Study of the Forces That Shape Our Criminal Law,* 51 Wash. & Lee

L.Rev. 1429, 1448-49 (1994) ("The primary justification offered for the contemporary felony-murder rule is deterrence."). The felony-murder rule not only deters felons from killing during crime, but also deters potential felons from committing the predicate offense in the first place. *Martinez,* 16 F.3d at 207; Cole, *supra,* at 110. Society reaps these deterrent benefits anytime punishment is imposed for a death that foreseeably results from commission of a felony. *See* Paul H. Robinson, *Imputed Criminal Liability,* 93 Yale L.J. 609, 665 (1984) (recognizing that punishing any killing that foreseeably results from commission of a felony serves the purpose of general deterrence by deterring other felons or at least by making other felons more careful to avoid the risks of causing death). Punishment imposed for the death of a cofelon may deter future dangerous felonies to the same extent as punishment imposed for the death of our most valued citizen.

Moreover, we think it worth noting that the deterrent effects of a felony-murder rule that penalizes cofelon killings redound, at least partially, to the benefit of the general public. A reduction in the number of dangerous felonies committed will save lives indiscriminately, sparing the innocent citizen and the potential felon alike. Consequently, even if we assume the legislature would not be terribly concerned about safeguarding potential felons from dangers that spring from their own malicious designs, a legislature convinced of the utility of the felony-murder rule quite logically might opt to pursue maximal deterrence by applying the rule every time death results.[6] Consistent with the text of the federal felony murder statute, and in the absence of any contrary indication, we conclude this is precisely the route that Congress selected.

In an effort to avoid this result, Appellant Tham vests almost complete reliance in *United States v. Schwanke,* 598 F.2d 575 (10th Cir.1979). As will be seen, that reliance is misplaced. The *Schwanke* court construed a sentence enhancement provision contained in a prior version of the federal arson statute, 18 U.S.C. § 844(i). Based on the language of similar enhancement provisions

---

[6]Of course, a legislature might rationally decide that considerations other than deterrence justify limiting the scope of the felony murder rule to deaths of nonparticipants. In fact, several state legislatures have expressly limited felony murder liability to the killing of one other than a participant in the underlying felony. *See, e.g.,* Alaska Stat. § 11.41.110; Colo.Rev.Stat. § 18-3-102; Conn. Gen.Stat. § 53a-54c; N.J. Stat. Ann. § 2C:11-3; N.Y. Penal Law § 125.25; Or.Rev.Stat. § 163.115; Utah Code Ann. § 76-5-203; Wash. Rev.Code § 9A.32.030. Significantly, no similar express restriction appears in the federal felony murder statute.

in related statutory sections, the court concluded that § 844(i) seemed to contemplate "prohibition of harm to another person and not self-injury." *Id.* at 579. The *Schwanke* court therefore held that Congress did not contemplate enhancing the penalty under § 844(i) when the only injured party was the indicted defendant standing trial. *Id.* at 578.

The *Schwanke* court also suggested in dicta that even an injury suffered by a coconspirator would not trigger application of the sentence enhancement provision. *Id.* at 579. Drawing upon state court precedent from the felony murder context, the court reasoned:

> It would not be seriously contended that one accidentally killing himself while engaged in the commission of a felony was guilty of murder. If the defendant ... is guilty of murder because of the accidental killing of his coconspirator, then it must follow that [the deceased coconspirator] was also guilty of murder, and, if he had recovered from his burns, that he would have been guilty of an attempt to commit murder.

*Id.* (quoting *People v. Ferlin,* 203 Cal. 587, 596-97, 265 P. 230, 234-35 (1928)). The court therefore announced it was "not inclined to attribute to Congress an enhancement of the penalty where the only injury is to the criminal himself, or to his coconspirator." *Id.* at 579.

We need not address the scope or soundness of the *Schwanke* decision, however, because the present case involves issues that are distinct from those decided by the Tenth Circuit. Most prominently, the *Schwanke* case involved construction of a sentence enhancement provision in a prior version of the federal arson statute, whereas the present case concerns interpretation of the federal felony murder statute and a cross-referencing provision in the arson sentencing guideline. *See Martinez,* 16 F.3d at 207 (distinguishing *Schwanke* on this basis). In addition, unlike the situation in *Schwanke,* Appellant Tham's sentence has not been enhanced based on an injury he inflicted upon himself. To the contrary, Appellant Tham has been sentenced by reference to the first-degree murder sentencing guideline because he bears criminal responsibility for a felony that resulted in the death of another.

To the extent that statements in *Schwanke* may be interpreted as an endorsement of the view that the felony murder rule cannot be applied when the underlying felony causes the death of a coparticipant, we decline to adopt that dicta as the law of this Circuit. As previously discussed, the text of the federal felony-murder statute, interpretive authority from two other circuits, and the

dominant rationale underlying the felony-murder rule all dictate that the felony murder statute would apply whenever death results from perpetration of an enumerated felony, without regard to the decedent's status as a coparticipant. We perceive no justification for concluding, as the California Supreme Court evidently did in *People v. Ferlin,* that unless each participant in a felonious undertaking can be deemed criminally responsible for the death *of another,* none of them can be. In the context of the present case, even though Tony Tham was not criminally responsible for the death of another during perpetration of the arson, no reason is apparent why we should indulge the fiction that Andy Tham—by virtue of his status as a cofelon—cannot be considered criminally responsible for the death of another either. Although Tony Tham was a participant in the arson of the Fortune Garden restaurant, he was "another" relative to Andy Tham so his death may serve as a predicate for application of the federal felony-murder statute.[7]

### III. *CONCLUSION*

For the reasons stated above, we affirm Appellant Tham's convictions and sentence.

AFFIRMED.

---

[7]It strikes us as self-evident that the federal felony murder rule applies only when the death of someone other than the individual sought to be prosecuted results. The deterrent rationale of the rule would not be served by interpreting it so as to permit prosecution of an individual who had killed himself because adequate incentives presumably exist to preserve one's own life and, even when they do not, no additional incentives would be provided by the prospect of a posthumous conviction for one's own felony-murder. As a result, it is undoubtedly true, as the *Ferlin* court suspected, that a decedent would not be guilty of felony murder for accidentally causing his own death during perpetration of a felony. *See Ferlin,* 203 Cal. at 596-97, 265 P. at 234-35. It does not follow, however, that no deterrent value would be derived from prosecuting that individual's coparticipants under the felony-murder rule. To the contrary, application of the felony murder rule in such situations would be expected to discourage potential felons from employing lethal weaponry and from committing enumerated felonies.